UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA MARIE POWELL, et al.,    )
    )
    Plaintiffs,    )
    )
    v.    )    Case No. 4:14-cv-1230-AGF
    )
ST. FRANCOIS COUNTY, et al.,    )
    )
    Defendants.    )

## MEMORANDUM AND ORDER

This matter is before the Court on two motions for summary judgment: the first filed by Defendant Sarah Sutton in her individual capacity (Doc. No. 67), and the second filed by Defendant Sutton in her official capacity and by Defendant St. Francois County, Missouri (Doc. No. 58). Plaintiffs offered a combined response to both motions (Doc. No. 77), and the motions are fully briefed and ready for disposition. The motion of Defendant Sutton in her official capacity and St. Francois County (Doc. No. 58) will be granted; Defendant Sutton's motion in her individual capacity will be denied.

### BACKGROUND

**Events of August 26, 2013**

This case arises out of an alleged unlawful search of Plaintiffs' residence and related events that occurred on the evening of August 26, 2013. Plaintiff Melinda Hicks and her mother, Plaintiff Linda Powell, maintained a residence in the gated Goose Creek neighborhood of French Village, Missouri, located in Ste. Genevieve County, just outside of St. Francois County. During three separate instances—one in the early evening, the

second at approximately 10:00 p.m., and the third at around 11:00 p.m.—Plaintiffs were approached at their home by Defendant Sutton and Defendant Adam Reese. Defendant Jason Cox was with Sutton and Reese during the second and third interactions. This lawsuit arises out of Defendants' alleged conduct during these three interactions.

The facts and all reasonable inferences construed in Plaintiffs' favor show the following. Defendants Reese and Cox were "surety recovery agents," hired at the time of the incident by bail bondsman Norman Crumpecker. On the evening in question, Reese and Cox were pursuing Chris Reibe, either a neighbor or son of a neighbor of Plaintiffs whose bond had recently been revoked.

Defendant Sutton was the full-time Security Manager of the Goose Creek community. Sutton had been a security guard for Goose Creek since 2005, was named the assistant manager in 2009, and was promoted to head of security in 2011. Additionally, Sutton was a Class A law enforcement officer in the state of Missouri who was (and remains) a commissioned St. Francois County reserve deputy sheriff. Sutton earned police academy training from Mineral Area College in 2010 and was commissioned as a reserve deputy sheriff on the basis of such training and certification in January of 2013. As a reserve deputy sheriff, Sutton did not collect a salary or compensation of any kind from St. Francois County, or work any regular hours or shifts. Rather, Sutton was a part of St. Francois County's corps of approximately twenty such reserve deputy sheriffs, maintained to assist the Sheriff's Department in times of natural disaster or other emergencies. *Id*. Prior to being commissioned as a reserve deputy sheriff, Sutton underwent a background check, and as a reserve deputy sheriff, she stayed

current on her P.O.S.T. certification (continuing law enforcement officer education) requirements. *Id.* Following Sutton's commission as a reserve deputy sheriff, it was negotiated by leaders of the Goose Creek community and by the St. Francois County Sheriff's Department that in her role as neighborhood Security Manager, Sutton could wear her St. Francois County uniform and would have the ability to handle criminal matters and make arrests. Goose Creek's website also advertised Sutton's position as a deputy sheriff.

Reese and Cox understood that they were required by law to notify law enforcement of their intention to apprehend Reibe and to show law enforcement the related paperwork; they met those requirements by showing the relevant paperwork to Sutton on the day in question. They also asked her to accompany them during their search of the neighborhood. Sutton testified that she agreed to do so in her role as head of security for Goose Creek, because her "instructions from Goose Creek Lake Trustees at the time were to accompany, and where necessary assist, such bail bondsmen when they had occasion to seek bail-jumpers." (Doc. No. 68-1 at 2.) Sutton (or another security guard) had apparently assisted or accompanied bail bondsmen at Goose Creek approximately a dozen times before. (Sutton Dep., 54:7-17.) Sutton drove a marked Goose Creek subdivision vehicle during the ensuing neighborhood search for Reibe. (Doc. No. 68-1 at 3.)

In the first interaction with Plaintiffs on August 23, 2013, Sutton and Reese approached Plaintiffs' home in the early evening during their search of the neighborhood for Reibe after receiving several tips that Reibe was there. (Doc. No. 77-8 at PH 19.)

They knocked on doors and windows, and shone flashlights into Plaintiffs' house. Plaintiff Hicks was home at the time but did not come to the door and instead called her mother. Hicks' cousin Eric Patterson arrived at the house sometime during the first encounter and spoke with Sutton and Reese. (Powell Dep., 17:13-19, Oct. 9, 2015.) Powell, who was on the phone with Patterson during his encounter with Defendants, testified that Sutton introduced herself as head of security and a deputy sheriff for St. Francois County. *Id.* at 56:1-8. Sutton was wearing a polo shirt displaying a St. Francois County emblem as well as her gun and badge. Following a discussion with Patterson outside the residence, Sutton and Reese left.

Later in the evening, at approximately 10:00 p.m., Sutton and Reese returned to Plaintiffs' residence, this time also accompanied by Defendant Cox, and Plaintiffs stepped onto the porch to speak to them. Sutton introduced herself to Plaintiffs as "head of security," and Reese introduced himself as being from the "fugitive recovery task force." (Hicks Dep., 22:8-11, Oct. 9, 2015.) Plaintiff Hicks told Reese and Cox that she had given Reibe a ride earlier in the day, and Reibe had in fact come to her home for a brief period, but she had no idea as to his present whereabouts. Reese stated that he "kept asking [Hicks] the same questions . . . I think it upset her. She began to cry." (Reese Dep., 42:19-21, Oct. 20, 2015.)

Reese, Cox, and Sutton then appeared to leave the premises, but returned approximately an hour later. Reese testified that at some point between 11:00 p.m. and midnight, Reese and Cox decided "to take a tactical approach to the house." (Reese Dep., 44:6-19.) Cox approached from the back of the house and Reese and Sutton

approached from the front. Powell saw a flashlight at her bedroom window and Reese told her to "[g]et up and open the door." (Hicks Dep., 25:5-9, Oct. 9, 2015.) Hicks opened the front door and Hicks testified that Reese immediately pushed past her, with Sutton behind Reese. Cox knocked on the back door, to which Powell responded; Powell testified that Cox opened the door and pushed past her once she unlocked it. Reese and Cox proceeded to search the house. Plaintiffs have insisted that they never gave consent for the entry or ensuing search of the premises. Defendants argue that they were given consent to enter and search the home (although their accounts vary as to how and when such consent was given). For purposes of the motions, however, Plaintiffs' facts must be accepted as true. The parties all agree that Sutton did not search the house herself. Rather, she simply stood there while Reese and Cox searched for Reibe.

Hicks testified that for most of the encounter, she and her mother were "under the impression that they [Reese and Cox] were actually cops." *Id*. at 59:25-60:1. Plaintiffs testified that they continuously sought identification or proof of authority from Cox and Reese, but Cox and Reese refused to provide it. For example, Powell alleged that when she asked Cox for a search warrant or identification, Cox responded, "If you want play ID roulette, where the [expletive] is your ID?" (Powell Dep., 30:19-20.) On another inquiry from Powell as to identification, Reese displayed his driver license and Cox displayed a white card that Powell could not read. Cox also responded when asked that he didn't need a search warrant, and that he could "go in your [expletive] attic" if he wanted to. (Hicks Dep., 31:1-2.) Powell testified that she again tried to stop Cox when he entered her bedroom, where her sister was ill and sleeping; Cox allegedly entered and

searched the room anyway. (Powell Dep., 29:15-22.) Another relative, Jason Hicks, was also sleeping at the residence. According to Powell, upon seeing Jason Hicks, Cox picked up a baseball bat, and when Jason Hicks asked what Cox was doing, Cox replied that he was taking the bat for his protection and threatened to "shove the bat up [Jason Hicks'] [expletive]." (Powell Dep., 29:5-10.)

Powell testified that Sutton "didn't interact with [Powell] at all. She just stood there the whole time" during Reese and Cox's search of the home. (Powell Dep., 40:24-25.) However, Cox testified that Sutton "talked just about as much as everybody else did." (Cox. Dep., 30:13-15, October 20, 2015.) Powell called several law enforcement officials immediately after the incident. *Id.* at 38:22-39:25.

**Policies and Customs of the St. Francois County Sheriff's Department**

Daniel Bullock, Sheriff of St. Francois County, testified that the Sheriff's department was in a "working relationship" with Goose Creek neighborhood, and that there was an agreement that "Ms. Sutton would be a [reserve] deputy and at least would wear the uniform and that sort of thing" when working security at Goose Creek. (Bullock Dep., 49:16-25.) Notes from a meeting between Sheriff Bullock and the Goose Creek trustees explained that, even when acting as head of security, Sutton's status as a reserve deputy sheriff meant that she "CAN handle any criminal offense that occurs. This would include making arrest [sic] on open warrants. She would have the ability to hold or arrest

parties that are caught in criminal acts." (Doc. No. 77-7.)[1] The notes also define a division between Sutton's duties as deputy sheriff and her work as head of security:

> She would potentially be on call for [St. Francois County] 24/7, but they would only call her out if there was a situation that was in close proximity to Goose Creek and she would be needed until their officers get there . . . [St. Francois County] will have liability coverage for her while she is out on a call for them.

*Id.* Additionally, after listing some limits to Sutton's role as a reserve deputy, the notes explain that "she can only enforce State Statutes and Federal Laws. Nothing else that is based on [Goose Creek's] private covenants . . . However, she can still do what she currently does as a security officer for Goose Creek[,] just not as an officer of St. Francois County." *Id.*

Sheriff Bullock acknowledged at his deposition that Sutton would appear to the public to be an on-duty law enforcement official while wearing her uniform. *Id.* at 35:15-19. Sheriff Bullock also explained that, in their role as law enforcement officers, reserve deputies have the same powers and authorities as paid deputies. (Bullock Dep., 15:24-25; 16:1-2.) As a deputy sheriff, Sutton received nothing in writing regarding her job title or job duties. (Bullock Dep., 22:14-20; Sutton Dep., 31:5-15.) Moreover, Sheriff Bullock testified that he did not believe the St. Francois County Sheriff's Department had any written policies whatsoever on the date of the incident. (Bullock Dep., 6:7-19.)

---

[1] Although Defendants object to Plaintiffs' Exhibit 7 (Doc. No. 77-7) as hearsay (Doc. No. 79), in their depositions, Sheriff Bullock and Sutton testified consistently with the portions of the Exhibit on which the Court relies.

Both Bullock and Sutton testified that Sutton could be "activated" for emergency response by a call from the department at any time, and Sutton would be in radio contact with the department were she to undertake action in her role as a reserve deputy sheriff. (Sutton Dep., 38:12-18; 74:3-11; Doc. No. 77-7; *see also* Bullock Dep., 36:6-8, 41:24-25.)  Sutton testified that on prior occasions, she had made arrests in her role as a St. Francois County reserve deputy, but that in those instances, the department was aware of her actions on behalf of the county, and she wrote up incident reports following the event. (Sutton Dep., 41:19-21; Bullock Dep., 46:15-18.)  She cited as an example a domestic call within the Goose Creek neighborhood to which she had responded and in which she ultimately made an arrest.  Sutton testified that in that instance, a Sheriff's Department supervisor was aware of the situation, and Sutton filed an incident report.  (Sutton Depo., 41:19-21; 42:10-25.)  She testified she had never executed a search of any residence, though she had once entered a residence to let Ste. Genevieve County conduct a search. (Sutton Dep., 43:1-44:5.)

On the issue of assisting bondsmen, Sutton testified that she understood it was department policy not to be involved:

> Q: Have you ever asked anybody, say anybody from St. Francois County, what your duties were or what your responsibilities were and your limits might be in dealing with bondsmen?
> A: They take care of their own.  St. Francois County doesn't get involved.
> Q: St. Francois County does not get involved?
> A: No.
> Q: Where did you learn that?
> A: Talking to the sheriff.
> Q: Was this before the incident or after?

A: I believe we've had a conversation on both times with it.

(Sutton Dep., 52:11-24.)  Sheriff Bullock similarly explained that the department usually does not engage with or assist bondsmen in regular course, testifying that "[t]he sheriff's department . . . normally [doesn't] go out with bondsmen like that."  (Bullock Dep., 44:5-6.)  He further testified:

> Q: Now, do you have a policy and practice with regards to –
> with regards to dealing with bondsmen?  We talked a little
> about that with Ms. Sutton.
> A: Right.  And we do not have – it's not an unprecedented
> thing.  Normally, we do not get involved with bounty hunters
> or bondsmen, but it has happened in the past.  My officers
> have helped apprehend people that have jumped bond or
> whatever and helped a bondsmen [sic] out.
>         …
> Q: [If bondsmen have a warrant, you would] give that to a
> warrant officer and they would go out with the bondsmen, I
> take it?
> A: No.  They would go out by themself [sic].
> Q: They just go out by themselves?
> A: By themself [sic].

(Bullock Dep. 25:22-26:9, 26:16-21.)

Sutton testified that she had assisted bondsmen in her capacity as a Goose Creek security guard on occasions prior to the instance giving rise to this lawsuit.  (Sutton Dep., 54:7-17.)  Sutton had never communicated with the Sheriff's Department regarding these instances; instead, she testified that she undertook to assist the bondsmen in her role as head of security for Goose Creek.  Sutton testified that, pursuant to her instruction from Goose Creek's trustees, she would assist bondsmen "[a]nywhere that they need to go . . . locating the fugitive that they're looking for."  (Sutton Dep., 54:15-17.)  Sutton also testified that she never assisted bondsmen in performing an actual search.  (Sutton Dep.,

44:6-9.)  Specifically in regard to this incident, Sutton submitted an affidavit wherein she stated that she "gave no thought to St. Francois County's expectations or desires with respect to getting involved with bail bondsmen or their work in seeking bail-jumpers on the night of August 26-27, 2013, as I was not at any time that night called or dispatched to serve as a deputy for the County, and was not acting the course and scope of my duties for St. Francois County at any time that night . . ."  (Doc. No. 68-1 at 2.)

Finally, as of the date of the incident, Sheriff Bullock had received no complaints or reports of misconduct regarding Sutton.  (Doc. No. 62-1 at 2.)  He had also received no reports or complaints of incidents similar to that alleged by Hicks and Powell involving any St. Francois County deputy.  *Id.*

**Sutton's Hiring and Training**

In his deposition, Sheriff Bullock testified that unlike regular deputies for St. Francois County, who have to go through significant field training upon their installation as deputies, reserve officers such as Sutton are not subjected to any formal training process.  *Id.* at 15:3-22.  Instead, Sutton was hired as a reserve deputy sheriff on the basis of her police academy training and her continuing law enforcement education.  (Sutton Dep. 6:23-7:9; Bullock Dep., 16:18-22.)

Sheriff Bullock was familiar with the training that Sutton would have received. He founded the police academy from which Sutton obtained her police training, was involved in setting the curriculum, and is familiar with the faculty.  He commissioned Sutton based in part on information received through his contacts at the academy. (Bullock Dep., 10:9-17.)  Bullock testified that "the training at the [Mineral Area

College] police academy would have trained her properly and would have—should have had all the knowledge that she needed to come out and be a police officer." *Id.* at 17:11-15. He testified that he "[knew] she was taught" that the Fourth Amendment "gives citizens the right to be safe and secure from illegal searches and seizures." *Id.* at 18:15-17. He further testified that St. Francois County's policy with regard to searches of residences was that an officer could "get consent to search or get a search warrant," and also acknowledged an exception. He stated that policy was "[n]ot something that I would particularly convey to the officers, but something they learn in the academy and that they know." *Id.* at 24:11-25:11. As a part of her academy training, Sutton also had "on-the-job" training wherein she accompanied active duty police officers. (Sutton Dep., 40:21-24.)

At her deposition, Sutton was unable to communicate what rights the Fourth Amendment conferred, and acknowledged that she may have been inadequately trained in that area. (Sutton Dep., 45:1-9.) She testified that she was "a little unclear as to what the limits of [her] authority to enter a residence as a law enforcement officer would be without the consent of the individual," *Id*. at 74:12-17, and further stated in response to an inquiry about the protections of the Fourth Amendment, "Fourth Amendment rights, civil rights. I don't really understand what we did. I don't know." *Id*. at 44:17-25.

**Procedural History and Settlement**

Plaintiffs allege a violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 as against all Defendants (Count I).[2] Sutton was originally sued in her individual and official capacities as both a security guard at Goose Creek and as deputy sheriff of St. Francois County. But Plaintiffs dismissed their claims against Goose Creek Lake Trustees, Inc., and Sutton in her capacity as a security agent for Goose Creek. They are proceeding against Sutton solely "in her individual and official capacity in her role as a deputy sheriff of St. Francois County." (Doc. No. 73.) The settlement agreement between Plaintiffs, Goose Creek Lake Trustees, Inc., and Sutton (the "Settlement") stipulates that Plaintiffs' cause of action against Sutton "in her official capacity as a Deputy Sheriff of St. Francois County" remains a part of the action "only to the extent that St. Francois County, Missouri, or MOPERM (Missouri Public Entity Risk Management Fund), as the insurer for St. Francois County, Missouri, and Sarah Sutton, provides coverage for Sarah Sutton's liability in her official capacity as a Deputy Sheriff for St. Francois County, Missouri." (Doc. No. 68-2 at 3-4.) The next paragraph of the Settlement further stipulates that the claims against Sutton "in her individual capacity in her role as a Deputy Sheriff of St. Francois County" shall also remain a part of the cause of action "only to the extent that St. Francois County, Missouri, or MOPERM . . . as the insurer for St. Francois County and Sarah Sutton, provides coverage for Sarah Sutton's

---

[2]     The Court notes that Counts II and III of Plaintiffs' Complaint originally asserted additional claims under state law, but have since been dismissed as against all Defendants. *See* Doc. No. 74. Thus, Count I is the only cause of action remaining before this Court.

liability in her individual capacity as a Deputy Sheriff of St. Francois County, Missouri." *Id.* at 4. The Settlement reiterates that Plaintiffs "will proceed against Sarah Sutton in Count I only in her individual and official capacity in her role as a Deputy Sheriff of St. Francois County, Missouri . . ." *Id.* at 9.

The only pertinent insurance coverage by St. Francois County is the MOPERM policy, and MOPERM provides coverage only to "[a]ny employee or authorized volunteer of the Member Agency while acting within the course and scope of their duties." (Doc. No. 68-7 at 4.)

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted). "The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 (8th Cir. 2012) (citation omitted).

## DISCUSSION

Sutton brings two separate motions for summary judgment: one in her official capacity, joined by Defendant St. Francois County, and one in her individual capacity.

The Court will address the arguments raised in each motion, and the responsive arguments raised by Plaintiffs, in turn.[3]

### *Sutton in Her Official Capacity/St. Francois County*

Plaintiffs' sole remaining claim against Sutton in her official capacity and against St. Francois County[4] is a § 1983 claim alleging entry into and search of Plaintiffs' residence in violation of the Fourth Amendment. Plaintiffs claim that Sutton used her authority as deputy sheriff to gain access to Plaintiffs' home in violation of the Fourth Amendment's prohibition on unlawful searches and seizures.

"[I]t is well established 'that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Johnson v. Douglas Cnty. Med. Dep't,* 725 F.3d 825, 828 (8th Cir. 2013) (quoting *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1214 (8th Cir. 2013)) (citation omitted). Nevertheless, a municipality may be sued directly under § 1983 where:

> the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision

---

[3]    In reply briefing on Sutton's individual motion, Sutton requests that the Court deem each of her twenty numbered factual paragraphs admitted because Plaintiffs did not dispute those facts in a format strictly in compliance with Local Rule 7-4.01 (E), but instead rebutted Sutton's factual statements in narrative format. Plaintiffs have also alleged that Sutton failed to strictly adhere to the Local Rules by citing to material not laid out as a part of the statement of facts. The Court rejects both of these arguments, and is satisfied that, while the facts have not been presented in an ideal format, both parties have presented the facts in a manner sufficient for the Court to adjudicate the merits of the issues presented.

[4]    Claims against Defendant Sutton in her official capacity as a St. Francois County reserve deputy sheriff are construed as claims against the county itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). For simplicity, the Court will refer to St. Francois County and Sutton in her official capacity, collectively, as "St. Francois County."

> officially adopted and promulgated by that body's officers. Moreover, . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Plaintiffs have alleged and argued that St. Francois County can be found liable under a *Monell* custom theory because, on the date of the incident, there were no written policies, guidelines, job duty descriptions, or written practices relating to the position of deputy sheriff whatsoever. (Bullock Dep., 6:7-19.) They argue alternatively for liability under *Monell* based on the theory that St. Francois County failed to train and/or adequately supervise Sutton.

In moving for summary judgment, St. Francois County argues that liability under *Monell* is inapplicable as a matter of law because no official St. Francois County policy sanctioned Sutton's behavior on the evening of the incident. Moreover, St. Francois County argues that there is no evidence of a pattern of such behavior, and that Sutton's behavior therefore cannot constitute a custom under *Monell*. St. Francois County further argues that Plaintiffs have not shown a "direct causal link" between a policy or custom identified and the subordinate's alleged misconduct, as required by *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

With respect to Plaintiffs' claims based on allegations of inadequate training and failure to supervise, control, and discipline, St. Francois County argues that Sutton was adequately trained for her role as reserve deputy sheriff by her police academy instruction and her status as a current holder of Missouri law enforcement credentials. More

pertinently, St. Francois County argues that it had no notice of a need for additional training, and therefore, there can be no liability under § 1983 on a failure-to-train theory. (Doc. No. 62 at 7-9.)

In response to the motion, Plaintiffs argue that St. Francois County's lack of written policies is sufficient to sustain a cause of action pursuant to *Monell* where it evidences a conscious choice by policymakers. Plaintiffs stress that this is not a case in which they are pointing to a specific but hypothetical policy that might have prevented the harm giving rise to this claim; instead, they point to the "absence of *any* express policies in the St. Francois County Sheriff's Department." (Doc. No. 77 at 15.) Moreover, Plaintiffs note that Sutton was not the only reserve deputy with an arrangement as a security guard for a gated community in St. Francois County.

Plaintiffs also argue that Sutton's lack of training and supervision is sufficient to create liability under *Monell*. Specifically, Plaintiffs point to Sheriff Bullock's testimony that "[w]e really . . . don't have a [training] process for reserve officers," (Bullock Depo., 16:14-15), and argue that St. Francois County's failure to supervise, control, and discipline Sutton creates liability. They cite *Andrews v. Fowler*, 98 F.3d 1069 (8th Cir. 1996), for the principle that municipalities can be held liable under § 1983 if they fail to adequately supervise an employee who causes a deprivation of constitutional rights. *Id*. at 1076.

### *Analysis*

"To establish municipal liability, a plaintiff must first show that one of the municipality's officers violated her federal right." *Veach v. Bartels Lutheran Home*, 627

F.3d 1254, 1257 (8th Cir. 2010). "If that element is satisfied, then a plaintiff must establish the requisite degree of fault on the part of the municipality and a causal link between municipal policy and the alleged violation . . . . Such a showing requires either the existence of a municipal policy that violates federal law on its face or evidence that the municipality has acted with 'deliberate indifference' to an individual's federal rights." *Id.* (citations omitted). It is a fundamental principle that municipalities cannot be vicariously liable under § 1983, but instead are "responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

At the outset, the Court concludes that Plaintiffs have offered sufficient evidence to maintain a claim that Sutton, an officer of St. Francois County, violated Plaintiffs' federal rights against unreasonable searches and seizures under the Fourth Amendment. Plaintiffs have submitted sufficient evidence to create a question of fact as to whether Plaintiffs consented to the search of their home by Sutton, Cox, and Reese, and there is no dispute that there was no warrant for the search. The Supreme Court has repeatedly expressed that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citations omitted). Having established that Plaintiffs offer evidence sufficient to maintain that an officer of St. Francois County violated their federal rights, the Court turns to whether a causal link exists between some policy and Sutton's alleged violation.

Here, Plaintiffs have offered no evidence of a facially unconstitutional written policy, nor have they alleged an affirmative pattern or custom of warrantless searches.[5] Instead, Plaintiffs direct the Court to St. Francois County's lack of written policies or procedures, and submit that such a lack of policies is sufficient to support liability under § 1983.

*Lack of Written Policies*

An absence of a policy can create liability under § 1983 only "where a [municipality's] inaction reflects a deliberate indifference to the constitutional rights of the citizenry[.]" *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 392 (8th Cir. 2007) (en banc). In *Atkinson v. City of Mountain View, Missouri*, 709 F.3d 1201 (8th Cir. 2013), the Eighth Circuit addressed whether "the absence of a binding, written policy . . . demonstrated deliberate indifference on the part of the [c]ity." *Id*. at 1216. In *Atkinson*, an off-duty police chief "bull rushed" the plaintiff, a veteran attending a football game, after the plaintiff attempted to break up a fight between two adolescents. The plaintiff spent 24 days in the hospital after suffering significant physical injuries. *Id*. at 1205. The plaintiff asserted claims against the police chief, in his official capacity, under § 1983.

In *Atkinson*, like in this case, the plaintiff could "point to no city policy or custom—written or unwritten—that was a 'moving force [behind] the constitutional violation.'" *Id*. at 1216 (quoting *Monell,* 436 U.S. at 694). The Eighth Circuit wrote that "a municipality may not be held liable under § 1983 merely because it failed to

---

[5] The only affirmative "pattern" that Plaintiffs allege is St. Francois County's pattern of allowing reserve deputies to serve as private security officers for gated communities. But that "custom" did not itself lead to Sutton's Fourth Amendment violation in this case.

implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion.  Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Id.* at 1216 (citations omitted).  Elsewhere, the Eighth Circuit has explained that deliberate indifference occurs when a defendant "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights."  *Larson by Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996) (citing *Canton*, 489 U.S. at 389).

Here, Plaintiffs have not proffered any evidence that St. Francois County had notice that a written policy was necessary to prevent unlawful searches by its reserve deputies, such that its failure to adopt such a policy constituted deliberate indifference.  In *Atkinson*, the Eighth Circuit affirmed the district court's grant of summary judgment, stating:

> Other than the single incident at issue in this case, [the plaintiff] has submitted no evidence of excessive force by [the defendant] or any other city police officer.  Because no reasonable jury could find the city had notice that its lack of written use-of-force policies was likely to result in a constitutional violation, the city's failure to adopt such policies does not create a genuine dispute of material fact.

709 F.3d at 1216.  Likewise, Plaintiffs in the instant matter have failed to adduce evidence that St. Francois County had notice that its lack of express policies was likely to result in a constitutional violation.  On the contrary, Bullock was familiar with the police academy training and with what Sutton was taught.  He testified that the Fourth Amendment "gives citizens the right to be safe and secure from illegal searches and seizures," and spoke to the circumstances under which searches were permitted.  (Bullock

Dep., 18:15-17)  Thus, the undisputed evidence shows that the municipality reasonably believed its reserve deputies to be sufficiently versed in the Fourth Amendment.  As such, the municipality was not deliberately indifferent in failing to adopt some express policy pertaining to lawful searches.  Plaintiffs offer no evidence that Sutton had ever previously searched a residence, or of any similar violation in the past that might have put St. Francois County on notice.  Therefore, as a matter of law, Plaintiffs' claims against St Francois County under § 1983 based on an absence-of-policy theory fail.

*Failure to Train, Supervise, or Discipline*

A similar analysis applies to Plaintiffs' argument that St. Francois County's lack of training, supervision, or discipline of reserve deputies like Sutton is sufficient to maintain a cause of action pursuant to § 1983.[6]  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick*, 563 U.S. at 61.  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.*

As in an absence-of-policy analysis, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of

---

[6]   Plaintiffs offer these as separate theories, but the Court will analyze them together. Under § 1983, "a claim for failure to supervise requires the same analysis as a claim for failure to train." *Robinette v. Jones,* 476 F.3d 585, 591 (8th Cir. 2007) (citing *Liebe v. Norton,* 157 F.3d 574, 579 (8th Cir. 1998)).  Similarly, the "[analysis of failure to supervise or control claims] would not materially differ from [a] failure to discipline analysis[.]"  *See Hinesley v. City of Lake Ozark, Mo.*, No. 08-04294-CV-C-NKL, 2010 WL 3613996, at *11 (W.D. Mo. Sept. 8, 2010) (citation omitted).

persons with whom the untrained employees come into contact.'" *Connick*, 563 U.S. at 61 (quoting *Canton*, 489 U.S. at 388). Claims predicated on a failure to train or supervise generally cannot succeed without evidence that the municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." *Parrish v. Ball,* 594 F.3d 993, 1002 (8th Cir. 2010); *see also Atkinson*, 709 F.3d at 1216-17 ("[The plaintiff] has presented no evidence indicating the city had reason to believe, before the events giving rise to this case, that its training or supervision of [the defendant officer] was inadequate."). Similarly, a failure to discipline claim hinges on whether a municipality had notice that its practices were inadequate; a single instance of inaction is not generally enough. *See Jenkins v. St. Louis Cnty.*, No. 4:10-CV-827-SNLJ, 2011 WL 5868310, at *12 (E.D. Mo. Nov. 22, 2011) ("As for the County's failure to discipline [the defendant officer], the plaintiffs fail to explain or offer any legal authority (within the Eighth Circuit) that such 'inaction' demonstrates prior notice by the County that its training program was constitutionally deficient."). In *Andrews*, the very case which Plaintiffs cite for the proposition that a failure to train or supervise can support liability, the Eighth Circuit made clear that "the plaintiff must demonstrate that the city had *notice* that its procedures were inadequate and likely to result in a violation of constitutional rights." *Andrews*, 98 F.3d at 1076 (emphasis added) (citation omitted). "Clarity of the municipal obligation is important in this context, because '[w]ithout some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell,*

imposing liability without regard to fault.'" *Szabla*, 486 F.3d 385, 393 (8th Cir. 2007) (citing *Canton*, 489 U.S. at 395.)

Again, Plaintiffs in the instant case have failed to provide evidence that St. Francois County had actual or constructive notice that training, supervision, or discipline for reserve deputy sheriffs was insufficient. They have offered no evidence of similar past occurrences, nor have their allegations been "accompanied by a showing that the municipality had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *See Szabla*, 486 F.3d at 393. On the contrary, Sheriff Bullock's testimony that he founded the police academy from which Sutton graduated, and that he was familiar with the training offered on Fourth Amendment compliance, suggests that the municipality reasonably believed its reserve deputies were sufficiently trained, and had no reasonable notice that additional training, supervision, or discipline with regard to Fourth Amendment issues was needed.

Further analysis is needed under the failure-to-train theory, however, because "[t]he Supreme Court has not foreclosed the possibility that a single violation of constitutional rights could trigger municipal liability" in a failure-to-train case. *Szabla*, 486 F.3d at 393 (citation and quotation marks omitted). The Supreme Court's decision in *City of Canton, Ohio v. Harris* suggested that even in the absence of a prior pattern of violations, in certain limited situations a need for training can be "so obvious," and "so likely to result in the violation of constitutional rights," that "the failure to provide proper training may fairly be said to represent a policy . . . for which the city may be held liable if it actually causes injury." 489 U.S. at 390. *Canton*'s example of such a situation is the

need to train police officers in the constitutional limitations on use of deadly force with regard to fleeing felons, given that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons." *Id.* at 390 n. 10.

The Supreme Court's recent decision in *Connick v. Thompson* revisited the single-instance liability theory preserved in *Canton*. *Connick*, 563 U.S. 51. In *Connick*, a claimant alleged that a district attorney's office violated evidence disclosure requirements under *Brady v. Maryland*, 373 U.S. 83 (1963), leading to a wrongful conviction and incarceration for eighteen years. In the claimant's cause of action under § 1983, he alleged liability under the theory that the violation was caused by the district attorney's "deliberate indifference to an obvious need to train the prosecutors in his office [on *Brady*] in order to avoid such constitutional violations." *Connick*, 563 U.S. at 57. The Supreme Court disagreed that this single violation was sufficient to create liability. Writing for the majority, Justice Thomas wrote that the district attorney "was entitled to judgment as a matter of law because [the claimant] did not prove that [the district attorney] was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different *Brady* training." *Connick*, 563 U.S. at 59.

Because Plaintiffs have offered no evidence that St. Francois County had notice of a need for additional training in the form of similar past occurrences, Plaintiffs' failure-to-train argument hinges on the single-instance theory of municipal liability. The Court is therefore left with the following question[7]: does St. Francois County's failure to train a

---

[7]    It is not entirely clear whether this is a question of law or of fact. *See Connick*, 563 U.S. at 72 (2011) (Scalia, J., concurring) (stating that the question of "whether a *Brady*

reserve deputy sheriff on the legal requirements of the Fourth Amendment amount to deliberate indifference to constitutional violations? The Court concludes that it does not. Sutton was hired on the basis of her certification as a Class A Missouri law enforcement officer primarily to help in times of natural disaster and other emergencies. She did not have regular duties, hours, or shifts for St. Francois County, and did not collect a salary or other pay from the municipality. Plaintiffs have offered no evidence that searches or seizures were an anticipated component of her role as a reserve deputy sheriff. Moreover, a primary municipal policymaker (Sheriff Bullock) was intimately familiar with the training she received at the police academy, and believed it to be sufficient in the area of Fourth Amendment training.

Thus, just as in *Connick*, "[t]he obvious need for specific legal training that was present in the *Canton* scenario is absent here." *See Connick*, 563 U.S. at 64. Given her limited role, and that Sutton already had training as a certified law enforcement officer, including on Fourth Amendment searches and seizures, a constitutional violation was not the "obvious consequence" of St. Francois County's lack of additional Fourth Amendment training for reserve deputies. *See Connick*, 563 U.S. at 66 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)). Because

violation presents one of those rare circumstances . . . in which the need for training in constitutional requirements is so obvious *ex ante* that the municipality's failure to provide that training amounts to deliberate indifference [is a legal one]"). *But cf. Davis v. Hall*, 375 F.3d 703, 719 (8th Cir. 2004) ("[W]hether the defendants' conduct constituted deliberate indifference is a classic issue for the fact finder.") (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998). Because the Court finds that no reasonable jury could determine that St. Francois County's lack of a written policy on warrantless searches for reserve deputy sheriffs amounts to deliberate indifference, the outcome is the same regardless of whether this question is resolved as one of law or fact.

Plaintiffs have not adduced any evidence that St. Francois County's failure to train its reserve deputies has resulted in recurrent episodes of constitutional violation, or any other evidence that St. Francois County had notice that its training and supervision was inadequate, Plaintiffs' failure to train claim also fails.

The Court having determined that, even construing the facts in the light most favorable to Plaintiffs, their claims for relief against St. Francois County and Sutton in her official capacity are insufficient as a matter of law, summary judgment will be granted.

### *Sutton in Her Individual Capacity*

In Sutton's motion for summary judgment in her individual capacity as a Deputy Sheriff of St. Francois County, she raises several distinct arguments. Sutton originally argued that she had consent to enter and search Plaintiffs' home during the incident, but has since conceded that Plaintiffs have submitted competent evidence creating an issue of fact as to whether consent was given (Doc. No. 79 at 4). The Court will therefore disregard Sutton's consent argument as originally briefed.

Sutton next argues that the Settlement releases Sutton fully in her individual capacity. Under the terms of the Settlement, Sutton is released from all liability, except for actions taken "in her role as a Deputy Sheriff of St. Francois County, Missouri . . . but only to the extent that St. Francois County, Missouri or MOPERM (Missouri Public Entity Risk Management Fund) provides coverage." (Doc. No. 68-2 at 4.) Sutton points out that MOPERM provides coverage only for acts performed "in the course and scope of [Sutton's] duties." (Doc. No. 68-7 at 4.) Sutton argues that she was not acting in the

course and scope of her duties with St. Francois County; therefore, she cannot be covered by MOPERM, and should be released from any claims against her in her individual capacity pursuant to the Settlement. (Doc. No. 68.) In the alternative, Sutton argues that she should be granted partial summary judgment with regard to punitive damages, attorneys' fees, and the first $1,000,000 of any judgment based on various other of MOPERM's provisions; or, that any violation she committed under § 1983 was *de minimus* and not actionable. *Id.*

Plaintiffs respond that Sutton was acting in the course and scope of her employment during the incident in question, and proffer, among other evidence, Sutton's introduction of herself using her law enforcement title, her St. Francois County emblazoned polo and her badge and gun on the night in question, and the fact that Defendants Cox and Reese specifically utilized Sutton's law enforcement credentials to satisfy their own legal requirements with regard to the fugitive Chris Reibe. (Doc. No. 77.) With regard to Sutton's alternatively pled grounds for summary judgment, Plaintiffs argue that the Settlement provides that St. Francois County—not just MOPERM—may be responsible for any judgment award to Plaintiffs, and rebut Sutton's argument that the facilitation of an armed intrusion into Plaintiffs' home could be a *de minimus* violation under § 1983. *Id.*

### *Analysis*

No party disputes that the Settlement was a contract entered into fairly, and that it is valid and binding on the parties. "Under Missouri law, the court must first determine as a matter of law whether a contract is ambiguous." *Shaw Hofstra & Assocs. v. Ladco*

*Dev., Inc.*, 673 F.3d 819, 826 (8th Cir. 2012) (quoting *United States v. Green Acres Enters., Inc.*, 86 F.3d 130, 133 (8th Cir. 1996)). "A contract is ambiguous when the terms are susceptible of more than one reasonable meaning." *Weitz Co. v. MH Washington*, 631 F.3d 510, 524 (8th Cir. 2011) (citation omitted). "Interpretation of a contract is a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute regarding the intent of the parties." *Id.* No party here has argued that the terms of the Settlement are ambiguous, and the Court perceives no ambiguity; thus, interpretation of the Settlement is a question of law to be decided by this Court.

According to the terms of the Settlement as written, Plaintiffs released Sutton from all liability, except for actions taken "in her role as a Deputy Sheriff of St. Francois County, Missouri . . . but only to the extent that St. Francois County, Missouri or MOPERM (Missouri Public Entity Risk Management Fund) provides coverage." (Doc. No. 68-2 at 4.) Thus, the Court must determine to what extent St. Francois County or MOPERM "provide[] coverage" for Sutton's alleged tortious conduct.

At the outset, the Court reiterates that it is "well established 'that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor.'" *Johnson*, 725 F.3d at 828 (8th Cir. 2013) (citation omitted). And the Court rejects any suggestion that "provides coverage" means something other than covering a claim through outside or self-insurance. As such, based on the facts that are undisputed, St. Francois County "provides coverage" for torts committed by Sutton only to the extent that it has independently agreed or contracted to do so. MOPERM represents such an

agreement, but Plaintiffs have not offered evidence of any other agreement or contract by which St. Francois County "provides coverage" for torts committed by Sutton. Thus, interpreting the evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs' claims against Sutton in her individual capacity survive only to the extent that the MOPERM policy provides coverage to St. Francois County.

As with the interpretation of the Settlement itself, interpretation of the insurance contract is a matter of law. *Midwestern Indem. Co. v. Brooks*, 12 F. Supp. 3d 1166, 1168 (W.D. Mo. 2014), *aff'd*, 779 F.3d 540 (8th Cir. 2015) (citing *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (en banc)). The MOPERM Memorandum of Coverage establishes "[c]overage for the Member Agency [here, St. Francois County] for claims on causes of action," and agrees to pay on behalf of the Member Agency (with some limitations not relevant here) "losses which the Member Agency shall become legally obligated to pay . . . ." (Doc. No. 68-7 at 1.) Importantly, the Memorandum of Coverage expressly limits "covered parties" to (in relevant part) "[a]ny employee or authorized volunteer of the Member Agency while acting within the course and scope of their duties."[8] *Id.* at 2. Therefore, MOPERM's coverage for Sutton's tortious behavior applies only to the extent she was acting in the course and scope of her duties for St. Francois County.

---

[8] Although "not necessarily conced[ing]" that she was an "employee" or "authorized volunteer" of St. Francois County at the time of the incident, Sutton has instead focused her argument on whether she was acting in the "course and scope" of her duties. The Court, without rendering any decision as to whether Sutton was an employee or authorized volunteer, will do the same.

Because the MOPERM Memorandum of Coverage does not define "course and scope of their duties," the Court turns to Missouri law to interpret the phrase. *See Newyear v. Church Ins. Co.*, 155 F.3d 1041, 1044 (8th Cir. 1998). In the analogous context of employment, the Missouri Supreme Court has explained that the "course and scope" language is "not . . . a measure of whether the injury-causing conduct of the employee occurred during work hours or work duties. It is well-settled that the course and scope of employment test is, instead, a test of whether the conduct of that employee was performed in furtherance of the employer's business." *Cluck v. Union Pac. R.R. Co.*, 367 S.W.3d 25, 29 (Mo. 2012) (en banc) (quoting *Daugherty v. Allee's Sports Bar & Grill*, 260 S.W.3d 869, 873 (Mo. Ct. App. 2008)). Even where not expressly or impliedly authorized, an act (1) done in furtherance of an employer's (or here, St. Francois County's) interest and (2) arising from "usual, customary and expected" employment activities may be construed as in the course and scope of employment. *Daugherty*, 260 S.W.3d at 873–74.

Because Sutton received little in writing regarding her job title or job duties, and because St. Francois County Sheriff's Department did not have any written policies whatsoever on the date of the incident, the Court must look to the evidence and circumstances to determine whether Sutton's activities on the night in question could have been undertaken "in furtherance" of St. Francois County's interests. Here, the Court determines that the record as submitted, construed favorably to the nonmoving party, creates a genuine factual question as to whether Sutton was acting in the course and

scope of her limited duties with the St. Francois County Sheriff's Department when she facilitated a warrantless search of Plaintiffs' residence.

The record as submitted makes this a close question. Sheriff Bullock and Sutton both provided strong evidence that accompanying bondsmen is not usually a part of the duties of either reserve deputy sheriffs or regular deputy sheriffs, and was not a part of Sutton's duties on the evening in question. However, their testimony was at times unclear and there is at least some evidence in the record from which a jury could infer that Sutton was acting both on behalf of Goose Creek and in furtherance of her duties to St. Francois County. For example, the notes from the meeting between Goose Creek trustees and representatives of the Sheriff's Department confirm that Sutton could make arrests on open warrants. And Sutton testified that she approved the paperwork for the bondsmen and that, if she had seen Reibe and a warrant had been issued for his arrest, she would have arrested him.

Construing the record in favor of Plaintiffs, as this Court must, the Court finds that a factual question remains as to whether Sutton's accompaniment of bondsmen was in the course of her duties as a reserve deputy sheriff. Therefore, summary judgment on the basis of the parties' Settlement must be denied.

Sutton next moves for partial summary judgment with regard to attorneys' fees, punitive damages, and any award up to $1,000,000 based on additional insurance coverage. These matters relate to damages, and the Court will reserve ruling on these matters in its present Order. A subsequent order dealing with these matters will follow.

Finally, Sutton argues that summary judgment is proper because her actions were *de minimus*. The Court rejects this argument. Construing the facts most favorably to Plaintiffs, Sutton entered a home in the middle of the night without consent, a warrant, or any other legal justification in order to facilitate a search of the premises. During this search, threats were made to the lawful residents of the home, and while Sutton proffers that she said nothing during the search of the home, Cox's testimony suggests that she "talked just about as much as everybody else did." (Cox. Dep., 30:13-15.) "[T]here are very few exceptions to the general rule that warrantless searches are presumptively unreasonable," *United States v. Jacobsen*, 466 U.S. 109, 141 (1984), and an intrusive search of Plaintiffs' home without a warrant is not a *de minimus* violation.

## CONCLUSION

**IT IS HEREBY ORDERED** that the Defendant Sarah Sutton's Motion for Summary Judgment in her individual capacity (Doc. No. 67) is **DENIED**, with Sutton's arguments relating to partial summary judgment to be addressed in a subsequent order.

**IT IS FURTHER ORDERED** that Defendant St. Francois County and Defendant Sutton's Motion for Summary Judgment in her official capacity (Doc. No. 58) is **GRANTED**.

The parties are advised that the jury trial in this matter is currently scheduled to

proceed on **Monday, March 14, 2016, at 9:00 a.m.**  A final pretrial conference will be scheduled by separate order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 18th day of February, 2016.